**NATIONAL COALITION FOR THE HOMELESS, et al., Plaintiffs,**

**and**

**The National Union of The Homeless, Intervenors,**

v.

**UNITED STATES VETERANS' ADMINISTRATION, et al., Defendants.**

**Civ. A. No. 88–2503–OG.**

United States District Court, District of Columbia.

May 22, 1989.

Jeffrey Pash and Robert Long, Covington &,Burling, Washington, D.C., for plaintiffs.

Arthur Goldberg and Mary Magee, Dept. of Justice, Washington, D.C., for defendants.

MEMORANDUM

GASCH, District Judge.

On December 12, 1988, this Court granted summary judgment and permanent injunctive relief for plaintiffs in this action. The Court set out a schedule for defendants to adhere to in implementing the Stewart B. McKinney Homeless Assistance Act. *See* 42 U.S.C. § 11411. Plaintiffs are before the Court on a motion for further order enforcing the permanent injunction. They contend that the Department of Health and Human Services ("HHS") is improperly refusing to consider applications from homeless providers for properties that have been declared suitable by the Department of Housing and Urban Development ("HUD"). Defendants contend that the statute does not require HHS to consider applications for suitable properties until the agency controlling the property declares the property excess or otherwise acts under Section 501(c) of the McKinney Act.

Plaintiffs seek an order (i) compelling HHS to accept and process applications for all properties that have been designated by HUD as suitable, (ii) barring the Army from transferring the Naval Reserve Center in Huntsville, Alabama, until the application from the Food Bank of North Alabama is considered by HHS, and (iii) requiring landholding agencies to publish their reasons for refusing to declare properties excess or make them available for interim use.

*Background*

Section 501 of the McKinney Act, codified at 42 U.S.C. § 11411, sets out the process by which vacant federal properties are to be made available to assist the homeless. Subsection (a) requires HUD to collect information about properties described as unutilized or underutilized by the landholding agencies. HUD must identify the suitable properties within two months after collecting the information, and notify the

landholding agency. 42 U.S.C. § 11411(a). The landholding agency has thirty days to either (i) declare the suitable property "excess" to its needs, (ii) "make the property available on an interim basis" to homeless providers, or (iii) explain to HUD and the Administrator of General Services ("GSA") why the property cannot be declared excess or made available on an interim basis. *Id.* § 11411(b).

HHS and GSA are to "take such action as may be necessary to make buildings and property identified under subsection (a) available" to homeless providers. *Id.* § 11411(c). The Court has interpreted this to mean that after properties are declared excess by the landholding agencies they may, but need not be, offered to other federal agencies before being made available to assist the homeless. *National Coalition for the Homeless v. Veterans' Administration*, No. 88–2503, Mem.Op. at 25, 1988 WL 136958 (D.D.C. Dec. 15, 1988). Finally, the statute provides that HHS can make properties available by way of leases lasting at least one year and that landholding agencies can make properties available by interim permit or lease. *Id.* § 11411(d).

The parties agree that applications are properly submitted only after a property has been designated as suitable by HUD. Plaintiffs contend that HHS is required to accept and process applications for all properties declared suitable, regardless whether they have been declared excess by the landholding agency. Defendants contend that HHS must accept applications only after the property is declared "excess" by the landholding agency; prior to that, the landholding agency should receive and process the applications.

*Facts*

The question of which agency should process applications for suitable property not yet declared excess is significant; approximately 90 percent of the properties identified as suitable by HUD have not been declared excess or otherwise acted upon pursuant to Section 501(b) by the landholding agencies. Since December, HUD has determined that approximately 1,515 underutilized properties are suitable. Of these, approximately 292 had been declared excess prior to HUD's suitability determination. Almost all of the remaining properties are still awaiting the excess determination by the landholding agency.[1] Thus, homeless providers can apply to HHS for only about 300 of the 1,515 properties identified as suitable by HUD.

When lists of properties determined to be suitable are published in the *Federal Register*, they are accompanied by an explanation of where applications should be submitted. The public is instructed that after the landholding agency makes its "excess" determination, GSA will publish a list of the properties declared excess. Homeless providers will then have 30 days to submit an application or expression of interest in the property to HHS. In addition, they may apply to the respective landholding agencies for use of property on an interim basis rather than waiting for the "excess" determination. The name and address of each agency's contact person is published along with the list of properties.

Plaintiffs contend that the landholding agencies do not have adequate procedures for processing or even accepting applications. They have submitted declarations from three persons who unsuccessfully sought to acquire suitable property from a landholding agency. In the most instructive example, Richard Hiatt, Executive Director of the Food Bank of North Alabama, attempted to lease the Naval Reserve Building in Huntsville, Alabama to store food. The Navy has leased the building

---

**1.** The landholding agencies' inability to make the "excess" determination within thirty days of the suitability determination is the root of the problem. If agencies made the "excess" determination quickly, plaintiffs could simply wait thirty days and apply to HHS if the property was declared excess. But the landholding agencies are not making the "excess" determination in a timely fashion, so the properties languish out of plaintiffs' reach for an indeterminate period since the landholding agencies seem unable to process applications for interim use. The Department of Defense controls most of the suitable properties identified by HUD, but is flirting with contempt of court by failing to make the "excess" determination for any of them.

from the City of Huntsville since 1948. The lease, by its present terms, provides that the property may be used "for any governmental purpose." Kane Declaration, Exhibit C. It also provides "The Government shall not assign this lease in any event, and shall not sublet the demised premises except to a desirable tenant, and will not permit the use of said premises by anyone other than the Government, such sublessee, and the agents and servants of the Government, or of such sublessee." *Id.*, Exhibit A, ¶ 3.

In November, 1987, Hiatt wrote the local commanding officer with his request to lease the property; Mr. Steven Kleiman, Director of the Department of Defense's ("DOD") Homeless Assistance Program received a copy of the letter. In February, 1988 Mr. Kleiman wrote Mr. Hiatt, informing him that DOD's authority to lease the building was governed by 10 U.S.C. § 2546, which required the participation of the City of Huntsville in any lease agreement. Mr. Hiatt was unable to secure the participation of the City of Huntsville.

On August 23, 1988, DOD declared the property excess to its needs. But on November 22, 1988 the GSA refused to accept the property and returned it to control of DOD on the ground that the terms of the lease with Huntsville precluded an assignment to GSA. Kane Declaration, Exhibit I. Mr. Hiatt wrote Mr. Kleiman in December, 1988 asking that the property be leased under the McKinney Act. Mr. Kleiman responded promptly, noting that the request had been forwarded to the appropriate Navy official and that "[i]f ... the building is unutilized, your organization may be eligible to claim the property for use." *Id.*, Exhibit 6. A HHS official, who was sent a copy of the letter addressed to Kleiman, also wrote in December informing Mr. Hiatt that HHS would not accept an application for the property since it was not listed as excess.

On January 25, 1989, Mr. Hiatt again wrote to Mr. Kleiman, asking about the building's status. The Director of Installations and Facilities of the Navy responded. He wrote that GSA had refused the property as excess because it "is a safety hazard with [a] large amount of friable asbestos" and because the lease with Huntsville "specifically stipulates that the property is to be used for 'Naval Reserve training purposes' only." [2] *Id.*, Exhibit 10. He indicated that the Navy had reported the property as unutilized to HUD. "If determined suitable, HUD will then report the property to [HHS] for an availability determination." *Id.*

After learning that the property was declared suitable by HUD on January 31, 1988, Mr. Hiatt wrote to Mr. Kleiman at DOD and Ms. Judy Breitman at HHS to advise them that the Food Bank sought to lease the property. On March 13 he sent a similar letter to Ms. Andrea Wohlfeld, who was listed in the *Federal Register* as the Naval contact person for Naval properties deemed suitable. *See* 54 Fed.Reg. 6034, 6035 (Feb. 7, 1989). On March 21 he was informed by HHS that HHS "only has authority to process properties that have been declared excess." The letter directed him to apply to the appropriate Navy official listed in the *Federal Register*. Mr. Hiatt again wrote to Mr. Kleiman to be sure that applying to Ms. Wohlfeld was the appropriate step to take in light of HHS' direction. *Id.*, Exhibit 16. He never received a response from the Navy's contact person, Ms. Wohlfeld. Two weeks later Mr. Hiatt was sent a copy of a letter written by Mr. Nelson of the Navy Department to the City of Huntsville indicating the Navy's desire to "abandon" the property since the Navy "no longer has a requirement for the leased premises." *Id.*, Exhibit 17. Mr. Hiatt wrote Mr. Nelson's superior officer to inform him that the property was subject to the McKinney Act and that he considered the Navy's action to be in violation of this Court's December 12 Order.[3] The

---

2. The lease was amended in 1956 to allow the property to be used for any governmental purpose. The GSA and the Navy apparently overlooked this amendment.

3. The Court's Order requires that "Properties deemed suitable shall not be available for any other purpose for at least 30 days. Once an application is received for utilitization of that

Navy did not reply. After this motion was filed, the government agreed not to take any action on the property pending disposition of the motion.

■ The government contends that Mr. Hiatt's experience with the Alabama property is much ado about nothing: The Navy determined that its lease with the City of Huntsville and possible asbestos contamination do not permit it to sublease the property to a homeless provider or make it available on an interim basis, and that is all the statute requires. Kane Declaration ¶ 9. This decision, in the defendants' view, satisfies the Navy's responsibility under Section 501(b) to transmit to HUD and GSA "a statement of the reasons why the property cannot be declared excess or made available on an interim basis." Although it is not clear that these reasons were transmitted to HUD and GSA, the Court agrees that these are not arbitrary and capricious reasons and that Section 501(b) is largely satisfied. But the evidence concerning the Huntsville facility is nonetheless significant; it demonstrates the ineffective manner in which the defendants, and the Department of Defense in particular, respond to applications from homeless providers.

### Discussion

The Court's December 12 Order clearly envisions that HHS alone will entertain applications. The Order provides:

> (3) Properties determined *suitable* shall not be available for any other purpose for at least 30 days. Once an application is received for utilization *of that property* by representatives of the homeless, that property may not be sold, transferred, or otherwise disposed of until *HHS* has completed its action on the application.

> (4) *HHS* shall complete its action on the application within 15 days of receipt of a completed application.... *HHS* shall make and maintain a written record of all

property by representatives of the homeless, that property may not be sold, transferred, or otherwise disposed of until HHS has completed its action on the application." *National Coali-*

actions taken in response to an application.

*National Coalition for the Homeless v. Veterans' Administration*, No. 88–2503, ¶¶ 3, 4 (D.D.C. Dec. 12, 1988) (emphasis added). In the earlier proceedings, however, the parties did not squarely address the question now presented, so the Court will consider the propriety of requiring HHS to process all applications.

In plaintiffs' view, the plain language of Section 501(c)—that HHS "take such actions as may be necessary" to make available the properties identified pursuant to Section 501(a) as suitable—requires HHS to process all applications for suitable properties. Defendants concede that Section 501(c) directs HHS to process applications for suitable properties. They contend, however, that other provisions in Section 501 demonstrate Congress' intent that the landholding agencies accept applications for the properties they control.

Section 501(d) provides two means by which properties may be leased to the homeless. The landholding agency may declare its "suitable" property "excess," whereupon it is transferred to GSA's control. It can then be transferred to HHS and made available by lease. The leasing and property transfer provisions of the Federal Property and Administrative Services Act ("FPASA") govern the HHS leasing procedure. *See* 40 U.S.C. § 484(k). The 1988 amendments to the McKinney Act provide a second method for making property available; the landholding agency may make its "suitable" property available to homeless providers without involving GSA and HHS by using an interim use permit or lease. Defendants argue that Section 501(c) cannot be read as requiring HHS to take action for properties not yet declared excess since (i) FPASA requires HHS to control properties before it leases them and (ii) requiring applications to be submitted to HHS would preclude the use of interim permits or leases. Moreover, HHS may waste valuable time and resources process-

*tion for the Homeless v. Veterans' Administration*, No. 88–2503, ¶ 3, 1988 WL 136970 (D.D.C. Dec. 12, 1988).

ing applications for properties that may never be declared excess by the controlling agency.[4]

■ Plaintiffs' response to the first contention is that they do not seek to require HHS to lease the property, only to process the application. Defendants see no distinction between accepting applications and making leases. However, there is nothing in FPASA that precludes HHS from reviewing applications and negotiating with homeless providers prior to actually leasing the property.[5]

As to the second point, plaintiffs demonstrate that having HHS process applications would not preclude agencies from making properties available by interim use permits or leases. The criteria presently applied by HHS relate to generic factors such as the environmental impact of the proposed use and whether the homeless provider has proposed an approvable program. Martin Declaration, ¶ 3; *see* 45 C.F.R. § 12.9–12.11. In short, HHS could apply the standard criteria to every application and then inform the landholding agency whether the application is satisfactory. The landholding agency could then make the property available on an interim basis or otherwise act in accordance with Section 501(b). Alternatively, the defendants could require homeless providers to apply to both HHS and the landholding agency. In any event, the addition of the interim use permit provision clearly does not change the clear language in Section 501(c) requiring HHS to process applications.

Plaintiffs also insist there would be no delay if HHS received applications since the Court's Order of December 12 requires HHS to process applications in 15 days (or extend the period with the permission of the applicant). Thus, the application can be processed by HHS (and perhaps forwarded to the landholding agency) well within the 30–day period in which the landholding agency must make the "excess" determination. It is true that this procedure may cause HHS to process applications for properties that are never declared excess. But it is equally true that defendants' interpretation may cause the landholding agencies to process or begin processing applications for properties that are subsequently declared excess. In short, under each interpretation, either HHS or the landholding agency may receive and process applications for properties it does not control.

Finally, plaintiffs claim that the congressional intent underlying both the 1988 amendments and the statute as a whole would be frustrated by allowing the landholding agencies to process applications. The McKinney Act was intended "to use public resources and programs in a more coordinated manner to meet the critically urgent needs of the homeless." 42 U.S.C. § 11301. The amendments were designed "to extend programs providing urgently needed assistance for the homeless." H.Conf.Rep. No. 1089, 100th Cong., 2d Sess., 67 (1988), U.S.Code Cong. & Admin. News 1988, pp. 4395, 4450. Plaintiffs contend that permitting the landholding agencies to process applications for 90 percent of the suitable properties would impede the goal of making properties available since the landholding agencies are unable to effectively process applications. *See supra* at 5–9; Field Declaration; Reinis Declaration; Plaintiffs' Exhibit A, Collins letter. Moreover, the Court's Order of December 12 requires HHS to act on applications within 15 days and maintain a written record of all actions taken in response to applications. These conditions do not apply

---

**4.** Defendants note that HHS regulations for processing applications to lease property under FPASA are cumbersome. However, the McKinney Act does not require that these same regulations be applied to McKinney Act properties; HHS is free to use whatever regulations or procedures are reasonable. *See* 42 U.S.C. § 11411(d)(2) (HHS "shall issue regulations permitting leases for such public health purposes").

**5.** The regulations promulgated by HHS pursuant to FPASA, 40 U.S.C. § 484(k), apply only to *surplus* property. 45 C.F.R. § 12.2. Yet HHS has quite correctly allowed homeless providers to apply for *excess* properties and then sought their transfer from GSA. Martin Declaration, ¶¶ 2–3. There is no reason this same latitude cannot be given to *suitable* properties.

to applications submitted to the landholding agencies.

*Conclusion*

■ The plain language of Section 501(c) directs HHS to process applications for suitable properties, as identified pursuant to Section 501(a). Nowhere does the statute restrict HHS' authority to only suitable and excess properties. The 1988 amendments did not amend the language in Section 510(c). Defendants' assertion that this "plain language" construction is inconsistent with the statute as a whole is not persuasive. Thus, plaintiffs' motion to compel HHS to accept applications for all suitable properties is granted. The request to bar DOD from transferring the Naval Reserve Center in Huntsville, Alabama is denied because DOD has stated why the property cannot be declared excess.

The request to have all landholding agencies publish the statements to HUD and GSA required by Section 501(b) is denied. The Court is unwilling to add further requirements to Section 501 unless compelled by agency misconduct. The record demonstrates that agencies are not making the required Section 501(b) decisions; there is no .evidence that the reasons for the few decisions made were arbitrary and capricious. Thus, requiring publication of the reasons would be premature at this time.